UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| | : | |
| PETER WILLIAM DiGIOVANNI, | : | |
| | : | |
| Debtor. | : | Bky. No. 09-12738ELF |
| | : | |
| ESTATE OF HELEN J. DiSABATO, Michele Demko and Norman Demko, Co-executors, | : : : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| 5. | : | |
| | : | |
| PETER WILLIAM DiGIOVANNI, | : | |
| | : | |
| Defendant. | : : | Adv. No. 09-00226 |

# MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiffs Michele and Norman Demko ("the Plaintiffs"), in their capacities as executors of the Estate of Helen J. DiSabato ("the Estate"), seek a determination that their $29,279.55 claim against Defendant Peter DiGiovanni ("the Debtor") is nondischargeable under 11 U.S.C. §523(a)(2), (4) and (6). The debt arises from shortcomings in the Debtor's performance as executor of the Estate, which resulted in him being held in contempt of court on more than one occasion by the Court of Common Pleas, Chester County, Pennsylvania.

In contesting the nondischargeability of the debt, the Debtor concedes that his conduct fell short of a reasonable level of professionalism. He denies, however, that his conduct was so

-1-

purposeful or wrongful as to render the debt nondischargeable.

For the reasons set forth below, I find that the Debtor's debt to the Plaintiffs is nondischargeable pursuant to 11 U.S.C. §523(a)(6).

## II. PROCEDURAL HISTORY

The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on April 15, 2009. (Bankr. Doc. # 1). On April 24, 2009, the Clerk gave notice that the deadline to file a complaint objecting to discharge of the debtor or to determine dischargeability of a debt was July 18, 2009. (Bankr. Doc. # 15). The Plaintiffs initiated this adversary proceeding in a timely manner by filing a Complaint on July 17, 2009. In the Complaint, the Plaintiffs assert that their claim against the Debtor is nondischargeable under 11 U.S.C. § 523(a)(2), (4) and (6). (Adv. Doc. # 1). On November 6, 2009, while this adversary proceeding was pending, the Debtor received his chapter 7 discharge.[1]

On March 3, 2010, the Debtor filed a motion for summary judgment in the adversary proceeding, which was denied on March 5, 2010 (Adv. Doc. #'s 15, 18). Trial of this proceeding was held on March 19, 2009. The parties submitted post-trial memoranda, the last of which was filed on May 17, 2010.

---

[1] In August 2009, the Chapter 7 Trustee filed a Report of No Distribution indicating that there was no property or money to be distributed and thus, the property had been fully administered. On November 6, 2009, the Debtor received his chapter 7 discharge. (Bankr. Doc. # 92). Of course, the discharge order applies only to those debts that are dischargeable. See 11 U.S.C. §727(b).

### III. FINDINGS OF FACT

Plaintiff Michele Demko ("Mrs. Demko") is the granddaughter of Helen J. DiSabato ("Ms. DiSabato"). Plaintiff Norman Demko is Mrs. Demko's husband. Ms. DiSabato died on March 11, 2006, leaving a Will dated September 3, 2005 in which she appointed the Debtor as her Executor. (Ex. P-2; Pre-Trial Stmt., Uncontested Facts ¶ 3). Pursuant to the Will, the Debtor was granted Letters Testamentary by Decree of the Register of Wills dated April 3, 2006. (Ex. P-3 & P-4; Pre-Trial Stmt., Uncontested Facts ¶5).

Over the course of a year after being appointed as Executor of the Estate, the Debtor's relationship with the Plaintiffs became strained because of his inattention to several legal matters he was handling for them,[2] one of which was the administration of the Estate. The escalation of their discord is evidenced in several e-mails from Mrs. Demko to the Debtor:[3]

In an e-mail to the Debtor dated December 17, 2006, Mrs. Demko wrote:

---

[2] The Plaintiffs engaged the Debtor's professional services for certain matters unrelated to the Estate. The Plaintiffs did not bring this adversary matter in their individual capacities, however. They are plaintiffs only as representatives of the Estate. Therefore, the dischargeability of claims, if any, arising from the Debtor's representation of the Plaintiffs in their individual capacities is not before me.

[3] Over the Debtor's relevancy objection, I admitted these e-mails into evidence. They are largely between Mrs. Demko and the Debtor. (Ex. P-34a-n). The Plaintiff agreed that these e-mails can be characterized as the Plaintiffs' attempt to contact the Debtor regarding his performance of certain services. (Trial Testimony (hereinafter "T.T.") at 10:39:35). (The trial was not transcribed. In this Memorandum Opinion, when referring to the trial testimony, I will cite the time stamp of the electronic recording.)

To the extent the e-mails were unrelated to the Estate matters, they were admitted for the limited purpose of permitting the Plaintiffs to establish that the Debtor's conduct with respect to the non-Estate matters may be probative of his knowledge or intent under 11 U.S.C. §523(a)(6). (T.T at 11:31:30). However, none of my findings are dependent on evidence relating to the Debtor's inaction with respect to the non-Estate matters.

> You told us the deadline to file [the Decedent's] taxes was in July, but you never told us anything further. Was that true? If so, what now that the deadline was missed? Also the adds [sic] ran months ago, have you done anything with the information given to you regarding the monies due her from Social Security? We want/need to close out her estate and clear these huge piles off our desks. In this particular instance, you not only have responsibility as our attorney, but also as executor . . . please don't continue to drag your heels, obviously this impacts our ability to move forward with our own taxes due in a couple of months, we need to have her estate closed. Please advise.

(Ex. P-34c).

Five (5) months later, in an e-mail to the Debtor dated May 2, 2007, Mrs. Demko wrote:

> Peter, I left you a voice message yesterday, but as usual didn't hear back from you so I am confirming what was said in writing. We have given you several deadlines that you agreed to but have not met, and now must put our foot down and demand you get our work done. . . Additionally you accepted the responsibilities of executor of G'mom's estate; however, you have done nothing and forced us to handle a good portion of her affairs. Furthermore, you haven't even felt the need to file her taxes in a timely fashion for the past two years, telling me that it doesn't affect our own (which cannot be true since it directly affects the amount that's left over which we inherit.) You promised me this would be done last June. Peter, almost another year has passed, it is way overdue, and I expect this to be completed and her estate closed by the end of this month.

(Ex. P-34j).

Two weeks later, in an e-mail to the Debtor dated May 18, 2007, Mrs. Demko wrote:

> . . . I don't believe it should take you over 6 months to turn over our files, regardless of how "time consuming" you claim that it is! Which is expressly why they need to be turned over immediately - getting our cases handled simply doesn't take this long; it is your negligence of them that has consumed your time. **Moreover, you were given a deadline of the end of May, 2006 in which to have Grandmom's taxes paid and estate closed . . . that's a year ago! What possible excuse do you believe is a logical explanation for your utter disregard of your responsibilities to your clients?**

(Ex. P-34k) (emphasis added).

One (1) month later, in an e-mail to the Debtor dated June 22, 2007, Mrs. Demko wrote:

-4-

> Peter, yet still another week has come and gone. I believe that is over a month since you put in writing that **you would deliver our files to us "over the weekend", and close up Grandmom's estate asap.**
>
> I keep emailing you because I am at a loss to know what is the proper way of handling someone who truly has no concern for his clients needs! I can only be so rude and loud on the phone . . . you should not thrill to push me there. But it doesn't matter how we treat you, you're set on just not doing your job.

(Ex. P-34m) (emphasis added).

Finally, one (1) week later, in an e-mail to the Debtor dated June 29, 2007, Mrs. Demko wrote::

> Hey Peter . . . imagine that, now two full months have passed since you sent a written email promising to drop off our files "over the weekend" and close out the estate "asap" . . . over a full year after you promised to do that already!
>
> No more excuses. You've left me no further room but to file the papers.

(Ex. P-34n).

To their chagrin, the Plaintiffs discovered during the course of their dealing with the Debtor, that he failed to perform certain necessary functions as the Executor. For instance, he never filed an Account, a Pennsylvania Inheritance Tax Return, or a Notice required by Rule 5.6(a) of the Orphan's Court Rules. (Ex. P-5; Pre-Trial Stmt., Uncontested Facts ¶ 7).

Based in part on these failures, as well as the fact that the Debtor was placed on "inactive" status by the Pennsylvania Supreme Court for noncompliance with his Continuing Legal Education requirements, on July 27, 2007, the Plaintiffs filed a petition in the Court of Common Pleas, Chester County, Pennsylvania ("the CP Court") to have the Debtor removed as Executor. (Ex. P-6; Pre-Trial Stmt., Uncontested Facts ¶ 8). The Debtor consented to his removal as Executor. By order dated September 4, 2007, the CP Court granted the petition,

removed the Debtor as Executor and appointed the Plaintiffs as co-Executors of the Estate. (Exs. P-9 & P-10; Pre-Trial Stmt., Uncontested Facts ¶ 9).

After the Debtor's removal as Executor, the parties' relationship deteriorated further. The CP Court's September 4, 2007 Order removing the Debtor as Executor provided that the Debtor was required "to return to the [Plaintiffs] all records that were entrusted to him as well as all estate documents." (Ex. P-10). Based on that Order, the Plaintiffs' counsel sent the Debtor a detailed letter dated September 5, 2007 asking him to turn over certain records in his possession related to the Estate, as well as several other files. (Ex. P-13). Having received no response, the Plaintiffs' counsel sent a second letter dated September 19, 2007 asking the Debtor to turn over the previously requested documents by September 25, 2007. (Ex. P-13; Pre-Trial Stmt., Uncontested Facts ¶ 12).

The Plaintiffs allowed several more weeks to pass, but the Debtor failed to send any documents responsive to either of the September 2007 letters. The Debtor conceded at the dischargeability trial that he simply neglected to open those letters within a reasonable period of time. (T.T. at 9:52).[4] Consequently, the Plaintiffs filed a petition for contempt on October 19, 2007 ("the First Contempt Petition"). The Debtor was served on October 26, 2007.

The Debtor did not file an objection or otherwise respond to the First Contempt Petition (T.T. at 9:51). On December 17, 2007, the CP Court held a hearing and found the Debtor in contempt. (Ex. P-15; Pre-Trial Stmt., Uncontested Facts ¶¶ 14-16). The December 17, 2007

---

[4] In attempting to justify his delay, he stated at the dischargeability trial that only some of the items requested by the Plaintiffs were in his possession. He also claimed that he did not have certain items, such as Social Security documentation, bank records, "other matters" and receipts. (T.T. at 9:52).

-6-

Contempt Order provided:

> Peter DiGiovanni, Esquire shall turn over to the law offices of MacElree Harvey, Ltd., by January 11, 2008, at 11:00 a.m., all records relating to the Estate of Helen J. DiSabato, including, but not limited to, receipts, stocks, bonds, real estate, bank records, and all tax data and Social Security documents and any other papers relating to the Estate, as well as all the documents requested in the September 5, 2007 correspondence from counsel for Michele and Norman Demko. In addition, Peter DiGiovanni, Esquire, shall pay reasonable attorneys fees, plus costs, to be determined by the Court as a sanction. Failure to provide the above documents will be considered a Contempt of Court subject to further sanctions.

(Ex. P-15). The Debtor was served with the December 17, 2007 Contempt Order on January 14, 2008. (Ex. P-16). Within a few days of service, the Debtor turned over a box of what he deemed the Estate documents he had in his possession.[5]

Several months later, the Plaintiffs' counsel sent a letter dated June 24, 2008 to the Debtor reminding him of the December 17, 2007 Contempt Order and asking him to pay attorneys fees and costs to purge himself of that contempt ("the June 24, 2008 Demand Letter"). (Ex. P-22 at Ex. E). The letter specifically requested the Debtor to pay $13,664.50 within twenty (20) days or the Plaintiffs would be forced to file another petition for contempt. (Id.). The Debtor did not comply with the demand.

---

[5] The box of Estate records the Debtor produced arguably was incomplete. Ms. Demko testified that they never received the Estate documents the Debtor was ordered to turn over. She said that the box the Debtor turned over was "garbage" and full of "unfiled papers that were completely unrelated to each other." She testified that it appeared to her that the Debtor had just thrown a bunch of papers into a box, which was "completely disorganized," "illegible and unusable." (T.T. at 11:41:08-45). Also, certain information and original documents that she initially provided to him were missing from the box. (Id. at 11:42:58-11:43:30). She claimed that the Debtor "set [the estate] backward" as they had to recreate much of the paperwork. (Id. at 11:42:10).

The Debtor testified that he believed he turned over everything he had in his possession, but acknowledged that one document pertaining to the Estate file was missing. (Id. at 3:20 - 3:21:22).

-7-

On July 22, 2008, the Plaintiffs filed a second petition for contempt ("the Second Contempt Petition"). (Ex. P-22). In addition to complaining that the Debtor failed to comply with the September 4, 2007 and December 17, 2007 Orders, and the June 24, 2008 Demand Letter, the Second Contempt Petition alleged that the Estate documents the Debtor delivered to the Plaintiffs in January 2008 were "worthless." (Id. at ¶¶ 8, 14-17). The Plaintiffs claimed that they "had to expend extra costs and attorneys fees to discover the costs basis for stock," which information was either in the Debtor's possession or should have been in his possession. (Id. at ¶ 18). They also mentioned that despite having requested a "myriad of documents," still outstanding were documents pertaining to the Debtor's representation of the Plaintiffs in other matters. (Id. at ¶ 19). The Plaintiffs requested the CP Court find the Debtor in contempt of court and to sanction the Debtor to pay the Plaintiffs reasonable counsel fees, as well as costs. (Id. at ¶ 26).

The Debtor was served with the Second Contempt Petition on September 23, 2008. (Ex. P-25). He filed a response to the Second Contempt Petition on September 26, 2008, but did not oppose the relief requested. (Exs. P-26 & P-27). In the response, the Debtor stated that:

- he had since found the second notice from the publication of the Estate, which he was delivering to Plaintiffs' counsel that day. However, such document was the last pertaining to the Estate he had in his possession. (¶ 17).

- the information regarding the cost basis for the Decedent's stock "should have been in [his] possession," but it was not and still was not. (¶ 18).

- he failed to cooperate with the Plaintiffs, but that such failure was due to his "negligence, not some intentional refusal." (¶ 23).

- he was liable to the Plaintiffs under "the current petition," but that the fees requested by the Second Contempt Petition did not relate to the estate. (¶ 24).

-8-

(Ex. P-27).[6]

On October 9, 2008, the CP Court entered two (2) orders finding the Debtor in contempt and issuing monetary sanctions (collectively, "the October 9, 2008 Contempt Orders"). (Exs. P-28 & P-29). The first of the October 9th Contempt Orders sanctioned the Debtor in the amount of $23,070.00 for attorneys fees incurred in connection with the prosecution of the Plaintiffs' contempt petitions and "for additional attorneys' fees incurred to complete the administration of the Estate." (Ex. P-28). The second October 9th Contempt Order imposed additional monetary fines in the amount of $6,209.55, which was comprised of $2,770.97 for income tax penalties and interest assessed against the Estate, $2,350.58 for Pennsylvania Inheritance Tax interest and $1,088.00 for costs incurred. (Ex. P-29). The Debtor was present in the courtroom as the orders were prepared and accepted service of both at that time. (T.T. at 10:08:14).

The Debtor never made any payments pursuant to the October 9, 2008 Contempt Orders. (T.T. at 10:10). Consequently, on April 8, 2009, the CP Court issued a bench warrant for the Debtor's arrest. (Ex. P-31).[7] The bench warrant resulted in the Debtor's arrest and incarceration for one (1) day. (T.T. at 10:12; Ex. P-32). One week later, on April 15, 2009, the Debtor filed his chapter 7 bankruptcy petition. He did so, in part, to stay the Plaintiffs' collection efforts in connection with the October 9, 2008 Contempt Orders. (T.T. at 10:12).

---

[6] At the dischargeability trial, the Debtor acknowledged that he had not turned over all of the documents requested. He testified further that he did not contest the Second Contempt Petition because he knew that he had not complied with the prior Orders. (T.T. at 10:06-07).

[7] This was the second bench warrant issued for the Debtor. A first bench warrant had issued on October 30, 2008, but was not executed. (Ex. P-30).

## IV. CONCLUSIONS OF LAW

### A.

One of the Bankruptcy Code's fundamental purposes is to permit honest debtors to reorder their financial affairs with their creditors and obtain a "fresh start," free from the weight of oppressive, preexisting debt. See, e.g., In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995). Therefore, in keeping with this goal, exceptions to discharge are construed narrowly, strictly and liberally in favor of debtors. E.g., id.; accord In re Sandoval, 541 F.3d 997, 1001 (10th Cir. 2008); In re Ferrell, 2006 WL 1997423, at * 3 (Bankr. E.D. Pa. June 14, 2006). A creditor objecting to the dischargeability of a debt bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the discharge exceptions enumerated in 11 U.S.C. § 523(a). Grogan v. Garner, 498 U.S. 279, 291 (1991).

The Plaintiffs' adversary complaint states three (3) non-dischargeability claims under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). Because I find the debt at issue nondischargeable under §523(a)(6), it is unnecessary to determine the Plaintiffs' claims under §523(a)(2) or §523(a)(4).

### B.

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

The key phrase in §523(a)(6) is "willful and malicious injury." Recently, in In re Coley, 433 B.R. 476 (Bankr. E.D. Pa. 2010), a case involving a debt arising from the breach of a contractual duty (rather than a debt arising from a tortious act or the violation of a court order), I

-10-

had occasion to consider the meaning of the statutory phrase "willful and malicious injury." In doing so, I pointed out that the natural reading of this phrase suggests that the terms "willful" and "malicious" be treated as distinct elements, with separate meanings. Most, but not all, courts have so construed the statute in §523(a)(6) nondischargeability proceedings. Id. at 497; accord 4 Collier on Bankruptcy ¶523.12[2], at 523-92 (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2010) ("Collier"). But see In re Williams, 337 F.3d 504, 509 (5th Cir. 2003) ("The test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor") (quoting In re Miller, 156 F.3d 598, 606 (5th Cir. 1998)).

Under §523(a)(6), the term "willful" encompasses "actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury." Coley, 433 B.R. at 497 (citing Kawaauhau v. Geiger, 523 U.S. 57 (1998) and In re Conte, 33 F.3d 303 (3d Cir. 1994)). Stated slightly differently, for there to be a willful injury, the Bankruptcy Code requires "a deliberate action that is substantially certain to produce harm." Conte, 33 F.3d at 309. This formulation of the test for "willfulness" must be qualified, however, by the Supreme Court's admonition in Geiger that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." 523 U.S. at 64. It also leaves open the question whether the "substantial certainty of producing harm" aspect of "willfulness" is measured objectively or subjectively. Coley, 433 B.R. at 497 n.32.

As for the term "malicious," most courts in bankruptcy nondischargeability proceedings have construed the term to refer to injuries that are "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." Id. at 498 (citations omitted, emphasis in original). That is the standard in the Third Circuit. Conte, 33 F.3d at 308 (no showing of

-11-

Document    Page 12 of 19

specific malice is required under §523(a)(6)).[8]

## C.

The Plaintiffs request that the court streamline the decision in this proceeding by holding, as a matter of law, that the Debtor's knowing failure to comply with the orders of the CP Court caused a willful and malicious injury under 11 U.S.C. §523(a)(6). (See Pls.' Reply Mem. at 3-5). In support of this argument, the Plaintiffs cite In re Allison, 176 B.R. 60 (Bankr. S.D. Fla.1994), In re Behn, 242 B.R. 229 (Bankr. W.D.N.Y. 1999) and In re Williams, 337 F.3d 504 (5th Cir. 2003).[9]

---

[8] As I pointed out in Coley, the "black letter" definitions of "willfulness" and "malice" stated above in the text create certain conceptual difficulties. 433 B.R. at 498-500. These difficulties are most conspicuous when the debt sought to be excepted from discharge under §523(a)(6) arises from the breach of a contractual obligation. See Bryan Hoynak, Filling in the Blank: Defining Breaches of Contract Excepted from Discharge as Willful and Malicious Injuries to Property under 11 U.S.C. § 523(a)(6), 67 Wash. & Lee L.Rev. 693 (2010) ("Hoynak"). Perhaps to a lesser degree, conceptual difficulties also arise in §523(a)(6) nondischargeability proceedings involving debts arising from tortious conduct.

The test for "willfulness" under §523(a)(6) set forth in Geiger requires deliberate conduct that is substantially certain to cause harm and a scienter that is something more than recklessness. One commentator has suggested that the Court in Geiger "defined willful to include wrongful behavior." Hoynak at 714. The fact that in Geiger, the Supreme Court insisted that §523(a)(6) includes a heightened scienter requirement lends support to the view that the "willfulness" element necessarily encompasses wrongful conduct. Consequently, one can legitimately question whether the "malice" element (requiring that the injury be wrongful and without just cause) adds anything to the "willfulness" element as it has come to be formulated. Perhaps then, there is some merit to the Fifth Circuit's approach of collapsing "willful and malicious" into a single test for nondischargeability under §523(a)(6), see Williams, 337 F.3d at 509, at least in nondischargeability proceedings involving a debt arising from tortious conduct, rather than debts arising from a breach of contract. However, in Conte, a decision that binds this court, the Third Circuit retained its allegiance to the traditional analytic dichotomy between "willfulness" and "maliciousness."

[9] Allison involved a creditor who sought injunctive relief against the debtor prior to bankruptcy based in part on the debtor's willful misappropriation of the creditor's confidential customer lists and for violation of state trade secret laws. After issuing a temporary injunction in which it found that the debtor violated his employment agreement with the creditor and wrongfully possessed its trade secrets, the state court entered an order finding the debtor in contempt based upon "substantial

-12-

It perhaps seems intuitive that a debt grounded in a court order holding a debtor in contempt of a prior court order is a debt for a willful and malicious injury,[10] so long as the

---

violations" of the temporary injunction. Ultimately, the state court entered an order approving a settlement under which the debtor stipulated to the entry of judgment concerning his violations of the state trade secret law. Accordingly, there were two judgments at issue in the dischargeability matter: (1) a consent judgment; and (2) a contempt judgment. As to the dischargeability of the contempt judgment, the court simply stated that the "[f]ailure to comply with court directives contained in an injunction order satisfies the definition of 'willful and malicious' within 11 U.S.C. § 523(a)(6)." 176 B.R. at 64.

Behn also involved the violation of a temporary restraining order. The Behn court followed Allison and explained that

> [s]o long as the federal court with jurisdiction over the person who later files bankruptcy, has issued an order for the protection of someone else, and has communicated it clearly to the contemnor, then an intentional violation is not only willful, but is also "malicious" *per se*. The federal court has told the defendant the point at which lawful activity becomes "harm" under the law. To intend the violations is to intend the harm. What "cause" or "excuse" might be "just" was considered by the court in fashioning the protective order, and is not to be re-litigated when deciding whether the violation was intentional.

Behn, 242 B.R. at 239 (footnote omitted).

Finally, Williams involved a dispute between the debtor and a labor union in which the debtor knowingly hired non-union labor in violation of a collective bargaining agreement and subsequent violation of the entry of an agreed judgment requiring the debtor to abide by the terms of the collective bargaining agreement. The relevant portion of Williams pertains to the Fifth Circuit's determination of the dischargeability of the debt relating to the debtor's violation of the agreed judgment. The Fifth Circuit found that the agreed judgment served a similar purpose to the injunctions issued in Allison and Behn. It reasoned that Williams, the debtor, like in Behn and Allison, knew of his obligations, yet knowingly violated those obligations. The court concluded that even if Williams did not intend to injure the union, "the Agreed Judgment made him substantially certain that his acts would inflict injury." 337 F.3d at 512. In concluding the debt incurred from the violation of the agreed judgment was nondischargeable, the court stated that: "[c]ontempt may be characterized as an act resulting in intentional injury." Id.

---

    [10]    See In re Heyne, 277 B.R. 364, 369 (Bankr. N.D. Ohio 2002) ("a finding of contempt – which at the very least requires that the alleged contemptor must have knowingly disobeyed the underlying order – clearly lends itself to a finding of a deliberate and intentional act"); In re Blankfort, 217 B.R. 138, 145 (Bankr. S.D.N.Y.1998) (the "existence of the Injunction Order and the defendants' defiance of it removes the Contempt Judgment from the category of ordinary judgments for violation of common law or statutory duties. . . . [T]he Debtor's persistent violations of the Injunction Order . . . constitute the type of aggravating circumstances which the courts in the Second Circuit and elsewhere have found to be sufficient to satisfy the 'malicious' requirement of subsection (6)").

contempt order is based on a finding that the debtor knowingly violated the prior order. In this adversary proceeding, however, after a trial in which the parties fully developed the record relating to the Debtor's conduct, I find it unnecessary to decide this case based on the broad legal proposition urged by the Plaintiffs. Like the court in In re Nangle, 274 F.3d 481 (8th Cir. 2001), after considering the evidence regarding the Debtor's state of mind and conduct, I conclude that the Debtor's conduct caused a willful and malicious injury, rendering the subject debt nondischargeable under 11 U.S.C. §523(a)(6). See also In re Suarez, 400 B.R. 732, 737 (9th Cir. 2009) ("[w]hether contempt sanctions are nondischargeable . . . depends not on whether they are labeled 'contempt,' but whether the conduct leading to them was 'willful and malicious'"); In re Peckham, 2010 WL 3655496, at *20 (Bankr. D. Mass. Sept. 13, 2010) ("in the absence of collateral estoppel, the contempt judgment must be based on conduct of the debtor that is both willful and malicious for that judgment to be nondischargeable under § 523(a)(6), and . . . the surrounding circumstances will determine the true nature of the debtor's conduct") (emphasis added).

### D.

The Plaintiffs assert that the Debtor knowingly handled the Estate in an improper fashion while he served as Executor and exacerbated the Estate's injury after he was removed as Executor by failing to comply with the CP Court's successive Orders to turn over the Estate documents. Arguing through the prism of 11 U.S.C. §523(a)(6), the Plaintiffs contend that the Debtor knew and understood his obligations to the Plaintiffs and was aware that it was substantially certain – if not absolutely inevitable – that his failure to fulfill those obligations (including his disregard of the CP Court Orders) would cause injury to the Estate in the form of

-14-

monetary penalties, costs and attorneys fees.

The Debtor acknowledges the shortcomings in his representation and administration of the Estate, as well as his inattention to mailings from the Plaintiffs' subsequent counsel and the CP Court Orders. However, he denies any willfulness or malice. He depicts his improper behavior as merely negligent and unprofessional.[11]

After reviewing the evidence, I agree with the Plaintiffs and conclude that the Debtor's conduct was willful and malicious within the meaning of 11 U.S.C. §523(a)(6).

The Debtor had ample notice that he was acting improperly and unprofessionally and had an opportunity to prevent his inaction from snowballing into successive findings that he was in contempt of court orders. While the Debtor was the Executor of the Estate, the Plaintiffs gave him several opportunities over the course of a year to correct and/or disclose any problems he was having with the Estate administration. Also, on multiple occasions, the Plaintiffs advised him that they needed their files. The e-mails the Plaintiffs sent the Debtor exemplify their frustration resulting from his inattention to their concerns about the Estate administration, as well as their aggravation regarding his unresponsiveness in turning over their files. The Debtor provided no evidence disputing his receipt of the e-mails. The evidence suggests that he simply did nothing to remedy his deficits despite these very loud warnings. Even after being removed as

---

[11] In contesting the Plaintiffs' §523(a)(2), (4) and (6) claims, the Debtor also appears to suggest in his Post-Trial Memorandum that 11 U.S.C. §523(a)(7) is the sole provision through which a civil contempt sanction payable may be found nondischargeable. Section 523(a)(7) excepts from discharge certain "fines, penalties or forfeitures" that are payable to governmental units. The Debtor cites no authority for the novel argument that penalties payable to private litigants are encompassed by neither §523(a)(7) nor any other subsection of §523(a). I reject the argument. Accord 4 Collier ¶523.13 (aside from §523(a)(7), penalties "may be found nondischargeable under other parts of section 523(a) if, for example, they are part of a judgment found nondischargeable under section 523(a)(6) for willful and malicious injury").

the Executor, the Debtor continued to ignore the formal notice of his unprofessional conduct that he was given in the form of the CP Court orders. In the September 4, 2007 Order from the CP Court, he was specifically ordered to turn over the Estate documents. Instead, he did nothing.

While the Debtor seeks to explain his unresponsiveness by stating that he just neglected to open his mail in a timely fashion, I cannot accept this as a justification. Based on the sequence of events and the picture as a whole, the Debtor's conduct cannot be characterized as mere negligence. Rather, his inaction was akin to willful blindness.

The Debtor did not simply make one or two errors. For nearly three (3) years, both before and after the entry of the court orders, he consciously ignored his obligations to the Plaintiffs, knowing full well that his actions would have adverse financial consequences to the Estate. For example, in responding to the question why, as a professional, he did not open his mail, and why it was not a "purposeful" act with expected consequences, the Debtor said it was not an affirmative policy or decision to NOT open the mail. But, he testified that he acknowledged that he understood there would be consequences for not doing so. (T.T. at 11:01:25-11:02:41).

Perhaps the Debtor's defense that his conduct was not "willful" would have gained some traction if he had not complied with only one CP Court Order or if he demonstrated that he did something to fulfill his obligation to the Plaintiffs under the court orders or if he had provided some plausible excuse for his continued inaction. But, the Debtor provided no rational explanation for his total failure to act over an extended period of time. He stated only that he was unable to "bring himself" to turn over the documents "in a normal, timely professional manner." (T.T. at 2:41:30-2:42). When questioned on cross examination about what prevented him from fulfilling his obligations, he again appeared to suggest that he experienced a kind of

paralysis, testifying that when he drafts documents or participates in litigation, the creative act of assembling documents is "psychologically painful to do more and more." (T.T. at 2:55:44 - 2:56:27). Without a more concrete, excusable basis for his inaction, the Debtor's testimony does not make out a defense; it is only a further description of his wrongful pattern of ignoring his obligations to the Plaintiffs and the CP Court.

The inadequacy of the Debtor's purported justification of his conduct is further illustrated by his inconsistent testimony regarding his failure to file the inheritance tax return. (T.T. at 3:11:23). On the one hand, the Debtor testified, unconvincingly, that part of the explanation for not filing the return was that he required certain necessary information from the Plaintiffs (i.e., bank accounts and investment accounts) that he had requested. (T.T. at 3:12).[12] On the other hand, he testified that he could not bring himself to do it, even though he knew he had to get things done. He acknowledged he had an obligation to complete the inheritance tax return, but could not explain why things were so hard for him. He said things were "psychologically painful" for him (T.T. at 3:14:43), and he "did not have the vocabulary" for explaining it (T.T. at 3:15:20). Yet, the Debtor did not provide any evidence that he sought professional help or received treatment. This was merely his own, self-serving perception of his dysfunctional behavior. (T.T. at 3:15:30).

---

[12] The Debtor's trial testimony was the only evidence that his ability to file the inheritance tax return was hampered by a lack of cooperation from the Plaintiffs. He offered no documentary evidence to corroborate the testimony. (T.T. at 9:58; 3:11-3:12). Mrs. Demko contradicted the Debtor by testifying that she provided the necessary information to the Debtor. (T.T. at 11:40). On this point, I find Mrs. Demko's testimony more credible than the Debtor's. I also note that the Debtor acknowledged that his inaction could not be attributed entirely to the Plaintiffs. (T.T. at 10:58:22; 3:12). He explained that there were some things that he could have (and should have) done that he did not, which were not dependent upon their cooperation. He conceded that he could and should have pressed the Plaintiffs harder for those items. (T.T. at 10:59:32-57).

Similarly, when asked why he failed to comply with the September 4, 2007 Order to turn over the Estate documents, the Debtor stated that he had the intention to do it, but "just couldn't get himself to do it." He said that he planned to, but he just "couldn't get it done." (T.T. at 3:17:26-58). And, despite his understanding that all he needed to do was turn over the estate file to the Plaintiffs, which he estimated to be about only one (1) inch thick, he provided no explanation as to why it was such a complicated task, other than an unconvincing assertion that it was separated in multiple places at that point in time. (T.T. at 3:18:57).[13]

Based on the content of his testimony and his demeanor, I perceive the Debtor to be an individual who has been struggling professionally and emotionally. He appeared to be tired of and likely disenchanted with the legal profession. He had a flat affect, which contributed to his appearance as withdrawn and depressed. Despite these impressions, the record does not support a finding that the Debtor was so psychologically impaired during the relevant time period that he lacked the requisite scienter to act "willful and maliciously" within the meaning of 11 U.S.C. §523(a)(6). The existence of the successive CP Court Orders, two of which held the Debtor in contempt of court, coupled with the evidence of his neglectful behavior prior to the entry of those Orders, leads me to conclude that the Debtor knew with substantial certainty that his deliberate, ongoing inaction and delay, for which he had no justifiable excuse, would result in adverse financial consequences to the Estate. Therefore, I find that his debt to the Plaintiffs is nondischargeable under 11 U.S.C. § 523(a)(6).

---

[13] Ms. Demko testified that the file was a few inches larger that the Debtor's estimate (T.T. at 12:35). I need not resolve that disparity. Either way, the file was relatively small and not extensive. Yet, the Debtor still was unable to deliver it to the Plaintiffs in compliance with the CP Court Order.

## V. CONCLUSION

For the reasons set forth herein, I find, by a preponderance of the evidence, that the Debtor's debt to the Plaintiffs is nondischargeable under 11 U.S.C. §523(a)(6).

An Order in accordance with this Memorandum will be entered.

Date: January 5, 2011

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE

-19-